2-4-1952 Paula Appleton v. National Union Fire Ins. Co. of Pittsburgh, PA This case is brought against an insurance company under General Law 93A, the Consumer Protection Statute, and 176D, the statute that regulates claims handling. It's based on conduct that occurred in an underlying catastrophic injury case, a personal injury case that arose out of a motor vehicle accident. There are two statutory provisions that we allege that AIG violated in their course of handling that claim, that underlying catastrophic injury claim. That is, number one, that they didn't conduct a reasonable investigation of that claim. I assume we're familiar with the fact that your time is more limited than some other areas. But there was an offer, and it was a considerable offer. There were issues. This is not a case where they simply say, no, no, no, not an offer. We're not going to do X, Y, Z. There was an actual offer. It was very substantial, and actually, I believe, if I'm not mistaken, the jury verdict was even a bit lower than that. No, no, no. Actually, the offers during the course of the case prior to the 93A demand letter, the highest offer was $3.25 million. A year and a half before that offer, AIG knew from its defense counsel and from the jury evaluator service that if hired, that that case was worth $7.5 million plus prejudgment interest. Remember that it was a damages-only case. There is no question about liability. It's a case that's going to trial. The plaintiff is going to win. So they understood the value of that case predicted by the service that they hired and their counsel was $7.5 million. They had made an offer of $3.25 million. Counsel, can I ask you, because you started with your failure to investigate claim, but now it seems that you're really talking about the offer that was made and whether it was a reasonable offer after the damages became reasonably clear. One of the questions I had for you, actually, is how would you suggest we do the analysis in separating out your failure to investigate claim from the other?  Just let me just ask you a couple of specific questions before you answer. So for example, you just referenced the fact that AIG solicited an estimate from defense counsel, from a jury consulting firm that they hired, and then I think additionally from a number of internal adjusters, and then they hired some experts. So sticking to just the failure to investigate claim, given that they did all of those things to come up with the number that, as you argue in your brief, is actually a very good prediction of what the jury did, why was there a failure to investigate claim that should have gone to a jury here? Okay. There's a failure to investigate because, first of all, the case comes in in 2015, the end of 2015. And AIG does absolutely nothing for nine months. The only thing that they do then at the end of nine months is they hire defense counsel, Jim Campbell. They hire him to represent their insured. But don't they correspond with you and ask you for a full demand package during that time? Not in the earlier time period, not in that first nine months. In fact, there was a list. I thought, if you could just pause for a second, I thought it was in the first nine months. I thought they asked for the demand package in May or June, and then you provided it in April, and that's when, I'm sorry, in August, which is the nine-month mark, and that's when things really got moving. Am I misunderstanding the record? I don't believe so. I think that the communications, the earliest communications were with travelers who had the primary claim. And Attorney Bagduset had some communications with travelers. She actually tried to reach Nicole Washer at AIG, and AIG did not respond. Again, just to clarify, my notes based on the record say that the attorney, Ms. Bagdus, if that's correct, shared the demand package with the AIG adjuster for the first time in August 2016. Yes, that's correct. And that's when things really got moving, right? So they didn't have a demand package until that point. They didn't have a demand package. But is there anything that requires the demand package to be ready in three months, two months, a year? What happened is the case comes in in November-ish 2015. It's assigned to Nicole Washer. Her supervisor says, here's a list of tasks you need to complete. There's 20 or 25 of them. She does none of them. They then hire Jim Campbell. He comes in. And remember that Jim Campbell is hired to represent their insured. He doesn't discharge their duty because he's hired to represent their insured, which basically is going to be to represent that person zealously. He's going to be undercutting, basically, Paula Appleton's claim. They then hire Jim Campbell. He, in very, very short order, figures out that this is a damages-only case. Then there's the only damages investigation. After that point in time, the only damages investigation is conducted by him. Just back to Judge Riffleman's question, if the demand package comes in only when it does, is there any authority to suggest that because of that, you can't have a valid challenge to a failure to investigate prior to that time? No. And I want to make a point. Just explain that to us. Why wouldn't the demand package be a reasonable starting point for the assessment of the failure to investigate claim? Well, let me say two things about that. First of all, we don't allege, really, that our 93A claim starts until about October of 2017. Really what they did earlier is background to what continues to happen throughout the entire period of time. So this is background. These things happen. So for the failure to investigate purposes, when does the clock start where you start seeing that failure that gives rise to the 93A claim? That begins, I think, after that first mediation in March of 2017 when they start. That's before or after the demand package? That's after. So to Judge Riffleman's point, given the other things that you acknowledge they're doing for purposes of the claim that the offer is unreasonable, what supports the idea that there was a failure to investigate, starting with the mediation, up until some point in time? Okay. The failure to investigate really begins to create a problem in the fall of 2017. In the fall of 2017, the case goes back to mediation. This is the second mediation. And by now, had they been investigating, they would have had a lot of information. They would have had information that she was incontinent, that she was catheterizing herself. They would have had significant information about her injuries. They did not. That is when they ask Jim Campbell to say how much is this case worth, basically. That is when they start this jury evaluator process. But in terms of investigating the damages claim, the route that that takes is that it is aligned strictly with what the trial court is doing. So the damages experts align with that. And that process is not completed until just slightly before trial. In the damages-only case, one way, I guess, to ask the question would be, once they've done the evaluation of what the damages are going to be from a reasonable source for evaluating that, why should we care about whether they also did the other things that you ordinarily would do if particularly liability was on the table? In other words, at this point they know from all the sources you're identifying everything you need to know about what the case is worth. So whether they did the investigation or didn't do the investigation, which might be relevant to liability, what does it have to do with their knowledge of what the value of the case's damages was? Well, I think what our expert says is had they done that investigation, had they begun that earlier, they would have had all this information sooner. So had they asked about the... What's the time gap that the record supports for the gap between what they would have known had they reasonably been investigating and what they ended up knowing when they knew it by virtue of the reach out that they did to the jury experts and the like? I believe our expert says that no later than that earliest date that they got the evaluation. They would have had a full investigation. They would have been in a position to understand the liability and damages were reasonable. And how much sooner would have that been? That would have been at least by October of 2017. At the time of the first mediation? Yes, as opposed to they asked Jim Campbell in October, then they started the jury evaluation process. That finished in January of 2018. So certainly by January of 2018, they knew that liability and damages were reasonably clear. So that's the difference in that timeframe. So it's October 2017 to January 2018 is the gap. Right. That grounds the CHOP 93A claim for failure to investigate. That October 2017 is the timeframe. If they had investigated properly, they would have had enough information and know liability and damages were reasonably clear. But certainly even with what they did, by January 2018, they knew liability and damages were reasonably clear. I get the point that you don't need them both. You only need one or the other. But your point is you would have gotten it sooner than they got it, so you can still bring a claim for their failure to do what they should have done.  And frankly, in the end, it makes no difference because the damages for a knowing and willful violation are based on the jury verdict. So it doesn't really matter, and the damages aren't before you anyway. What do we do about the question of in ordinary negotiation, even though I know the value of something is X? Like I go to get a car. If I was a better negotiator, I wouldn't get so hung up on the sticker price and I'd ask for lower. So when they ask for lower, that doesn't indicate any CHOP 93A violation. That's the ordinary course of negotiation. They come in low. You come in really high. They settle in the middle. Everybody's happy. What about this record suggests that's not what happened? Because they stay too low. So, for example... What requires, if you kind of, I think the ballpark here was like they knew it was approximately $7 million. They came up with 3. What is wrong or coming too low? Maybe they can start off with, you know, 3. They could have said 3.5, 1.5, 2.0. Is your theory that anything under the 7 million is too low and violates the statute? Because the statute says they have a duty to effectuate settlement when liability and damages are reasonably clear. They have to do something to settle for a reasonable amount. And... What was your response when they came in low? Well, I think in the earlier mediations, there was an effort to continue to return to mediation. The very first mediation, they said, we need more information about this incontinence and these problems. And the plaintiff's counsel said, great, we'll get that. But just help me out. So they come in low, at a number you say low. And did you then offer a competing number? Yes. Yes. There was a demand and an offer at that first mediation. Their first offer at the first mediation, I believe, I don't have all of the numbers in front of me, but I believe the first offer was somewhere in the $500,000, $600,000, $700,000 range. Their final offer in March was $2 million. And what was your response offer or request? I believe it was in the $15,000,000 or $16,000,000 range. So you went down from your initial $17,000,000 demand? Yes. Because I assume, as is the normal pattern, the plaintiff made the initial request for $17,000,000 and then the insurance... For $18,000,000. $18,000,000 was the initial demand. And then the insurance company responded.  So I think sort of going back to Judge Halpe's question, or perhaps it was Judge Barron's, when I read the cases, it does say that what is reasonable in terms of a fair offer by the insurance company, and it's supposed to make a fair offer, I understand your point, regardless of what the plaintiff demands. But the cases seem to say that the insurance company can factor in what the plaintiff has demanded. So again, just very practically, which is I think what we're asking you here, in the course of normal negotiations, if the insurance company had an $18,000,000 demand and eventually learns this case is worth approximately $7.5 million, why is the $3 billion offer as sort of what they're starting with later on around October 2017, et cetera, why is that not reasonable? Because $7.5 million is roughly in between where you were and that number. Because when they learn it's worth $7.5 million, they've offered $2.65 million. They learn that, that it's worth $7.5 million, they do absolutely nothing, not one thing, for a year. They don't offer one more penny. But you didn't come down that much. No, no, no. The mediation has ended. And they don't do anything. There are no further offers. And the thing of it is to remember is... But at that time, do all they have in place is your outstanding offer of $15 or $17 or no? You mean outstanding demand? Demand, I mean. Yes. They have the outstanding demand from the mediation before they learned about the $7.5 million, and they don't go back to the plaintiff and make an offer. And remember... Last point. The duty is on the insurance company. It is not on the plaintiff. The last thing that I want to say is that these are issues that really need a trial. That's all we're asking for. They need a trial. If you look at all of the cases that AIG cites, there's only one case in that litany of cases that was ever decided on summary judgment. Because as you point out, these are complex issues. It counts about motive. Thank you. Thank you, counsel. At this time, would counsel for the appellees please introduce themselves on the record to begin? Good afternoon. I'm Bill Schneider from Morrison Mahoney for the National Fire Insurance Company of Pittsburgh, PA, and AIG Claims. May it please the Court. This case doesn't warrant a trial. The factual record upon which the defendants moved for summary judgment was not disputed in any material way. The record is robust, and it's robust for a reason, because those courts that have decided these issues at summary judgment have specifically pointed out that the paucity of a record is what drives these cases to trial. That was the case in the Urban v. Zurich motion. When you start looking at the underlying proceedings and why the court wouldn't entertain summary judgment, it's because all you had was a timeline of offers and amounts. Now, we did in the addendum, the second addendum, include a graph of the offers and the amounts, but I just want to address some of the points here. National Union was an excess carrier. The excess carrier is not on the clock until the primary tenders or pays its limit. That all takes place around the time that the parties are soliciting the demand package and planning to go to mediation. First mediation comes. Ahead of the first mediation, AIG, National Union, they evaluate the case. They put a value, because there's a companion case, Mrs. Appleton's husband, Jason Appleton. They put a value on it of $4 million. They get to the mediation. They make a series of offers. Their final offer is two. And one thing I think is very important for the court to understand is that none of these mediations were any of the offers made by AIG the last and final. In fact, in each of the mediations, the negotiations stopped because either the plaintiffs felt that AIG didn't have sufficient information to evaluate the claim or they were dissatisfied with the amount of the offers. AIG never said, well, we're going to pay $2.65 and left the building. The last two mediations were terminated because the plaintiff walked out. And, you know, the insurance company did what an insurance company should do, which is reevaluate the case. And I think there's some important points here. They performed a tech review. And both the tech review and the Magna Geri evaluator were undertaken to portray the claim and the light most favorable to the plaintiff based upon the information they had at that time. And if you look at the original demand package that's in the record, the biggest component of the damages being claimed were $10 million, actually $13 million for conscious pain and suffering, principally driven on the impact that Ms. Appleton's injuries would have on her new marriage and her ability to have children. You know, these are, you know, difficult damages to put numbers on. AIG's internal evaluation came up with an average of $4.9 million. They reevaluated the claim, adjusted their reserves, $5 million for Paula Appleton's claim. And, you know, we talk about the investigation. You know, the failure to perform a reasonable investigation only matters if the reasonable investigation would demonstrate that liability is reasonably clear. And, you know, there's a little bit of tension going on in the case law between, you know, the Supreme Judicial Court, which says, you know, listen, if there's a genuine good faith disagreement as to any element of, you know, the plaintiff's claim, then liability is not going to be reasonably clear. We submit that on the record for decision. I don't know how you can look at all the expert reports in the parties' respective positions and find that there wasn't a genuine disagreement over the value of the case. Counsel, while the plaintiff may continue to disagree, but it seemed to me that the case law requires the insurance company to decide, in its view, has liability or damages, using liability to cover damages has become reasonably clear. Why wasn't it reasonably clear to the insurance company that the case was worth about $7 million by early 2018? Because you did have, you know, the internal AIG adjusters giving their viewpoint, defense counsel, and then the independent jury consultants. So at that point, you've got three different data points. They're all not exactly the same, but they're converging around sort of the roughly $7 million range. Why isn't it at least enough to go to a jury for a jury to determine whether liability was reasonably clear to the company at that point? Well, so you have to look at whether or not, in the context of those evaluations, what the insurance company thought. The insurance company itself thought that the value of her claim was $5 million. Defense counsel provided a verdict range. That was in 2017. The Magna Jury Evaluator results came out in January of 2018. Be mindful that, you know, the plaintiffs filed suit and pursued litigation. The plaintiff's deposition doesn't take place until October and November of 2018. There's an independent medical examination that's performed in October of 2018. And on the heels of completing discovery, the parties go back to a third mediation. So, you know, there are certainly data points within the plaintiff's claim. For example, if you look at her demand letter in August of 2016, there's no reference or mention to lost wages, lost earning capacity. Could I understand, sir? You seem to be making an argument about when it would have been reasonably clear to you what the value of the claim was. Is that what you're talking about? Because that does sound like a dirty question. Well, no, our flagship argument is that, you know, there was always a genuine good faith disagreement as to the amount of the damages in the case. Well, I thought the argument was a legal one, which is regardless of us knowing the value was $7.5 million, in ordinary negotiating, we can go low. And if they never come back to a reasonable number close to $7, we can stay low. Well, that's true. Are you running that argument? Well, no. Well, of course we're making that argument.  That doesn't sound like a jury question. That sounds like a legal question. It is a legal question. And, you know, if you look at the manner in which the negotiation proceeds, you know, the company is returning to mediation for a third time. It's continuing to negotiate this $15.5 million demand. What's the lowest they ever came down to? $15.5 million. After the third mediation, the demand actually increased back up to $17.5. AIG offered $5, and there was never any response. And you'll see in the record the company continued to try and broker some sort of high-low agreement up until and even during the trial. Counsel, just to make sure that the court is clear here, the way I understand it, there are two different claims. There's a failure to investigate claim, and then there's a second claim, which I think has two subparts to it, which is did damages slash liability become reasonably clear at some point? And if it did, then the insurance company has an obligation to make a fair, just, equitable, prompt settlement. I may be getting the words slightly wrong, but am I correct about that? Correct. And Part 2B only kicks in if liability has become reasonably clear. Is that right, or do you disagree? No, that's correct. But if you assume it was reasonably clear to you, which would be favorable to plaintiffs, your contention is you still win on what Judge Ruckelman is referring to as 2B, because the record then shows we made reasonably in-the-ballpark offers given how high they stayed. That's correct. And you'll see that that was the result in Forcucci, and it was also mentioned in Bobick. You're saying that's a legal – following up on Judge Barron's question, you're saying whether or not your offer was reasonable is a legal question under the case law? That's just something that never goes to a jury? Is that your position? Correct. Well, I'm not going to say it never goes to a jury, but you've got cases like Forcucci, and you've got cases like Bobick, where this Court and the Supreme Judicial Court have affirmed grant of summary judgment in circumstances not identical, but somewhat similar to those here where the insurance company is making offers consistent with its evaluations against an extraordinarily high demand. I think the question I have, though, again focusing on whether this was supposed to go to a jury at the end of the day, is as your opposing counsel pointed out at the end of her argument, you do have all of this information by January 2018. So if I can focus you on that timeframe.  That is telling you from three different sources of data that the sort of roughly reasonable value of this case is somewhere around $7 million. And as she points out, and I think this is what the record reflects, you don't increase your roughly $3 million offer at that point or any time that year, actually, in 2018. It just stays right there. And I understand that what the plaintiff is demanding is part of the facts that you have to look at. I understand that from the case law completely. Nevertheless, you have an independent duty as the insurance company to make a fair offer. So why isn't, as opposing counsel has argued, why isn't the company's failure to increase the offer, at least to some extent after finding out that it is really roughly a $7 million claim, why isn't that enough to take it to a jury? Because the law doesn't require the insurance company to accede to demand or just make repeated offers until the plaintiff decides, well, you know what, now I'm ready to negotiate. They actually did. If you look at the record, from the very beginning until the very end, their resolution objective was to settle the case. I understand that. And again, this is a case where you made multiple offers, as you've said. But, again, I understand you don't need to keep making offers with no response. But my question was different than that. Your last offer was about $3 million. Then you find out the case is really worth about $7 million. And you don't increase your offer at all after that point. So I'm just asking about why wasn't there one additional increase over the next year? Or why can't they go to a jury? Because they were still looking into and investigating disputed aspects of the damages in the context of the litigation, as I had mentioned. That sounds like a jury question. In the year following. That goes back to the reasonably clear. Yeah, that sounds like a question to the jury. The other possibility I thought your answer was going to be because they stayed at $18 million. Well, maybe that's a jury question too. Is that really the reason you didn't go up? And maybe that's for the jury to decide. There's no evidence. The only evidence is that the carrier pursued a third mediation and tried to effectuate settlement. So there used to be no basis under your view for a jury to conclude that you didn't go up for reasons other than the fact they were staying so high. Correct. Thank you. If I could just make one last point in the sentence. On the failure to investigate piece, the burden there is to show that whatever investigation they claim the insurance company should have done would have rendered liability reasonably clear, and the record doesn't have any support for that claim. Thank you. Thank you. Thank you, counsel. Would counsel for the appellant please reintroduce herself on the record? She has a two-minute rebuttal. Yes, Kathy Jo Cook. Just a couple of questions. The questions of whether liability is reasonably clear, whether damages are reasonably clear, whether they've investigated it properly, whether the offers are sufficient, all of those are fact questions. All of those are questions to be answered at trial. Is that last one a fact question? Yes, it is a fact question, and all of those are answers. Well, what makes you say that exactly? I thought if the case law is you have to make a reasonable offer, and there's no disputed facts about what their state of their knowledge was when they made the offer, and no disputed fact about the height of your offer, and that add one, I think, no disputed fact about the reason they didn't make a higher offer, what would be for the jury to decide? Because that is the issue, the reason they didn't make a higher offer. Okay, so that's the fact question. Right. Let me give you an example. So at the very last mediation, the plaintiffs didn't want to go. Because this is October 2018. At the very last trial. Is this October 2018, just so we understand? No, it's December of 2018. December 2018. Plaintiffs don't really want to go because they don't want to drag Ms. Appleton in again for them to not make a decent offer. They call them up and they say, we're not going to come unless you'll go in at $6 million. We want to try to get the case done, but we want to know you're really serious. And they say, no, we're not going to do that, but we promise we'll make it worth your while if you come. They increase the offer after they have all of the information, all the expert disclosures are done, all the depositions are done. They increase the offer by $600,000. That's the $3.25 million offer. That's the one. It's three months before trial. And, of course, the plaintiffs then leave the mediation because they're obviously not being reasonable at that point in time. Everything is completely done at that point in time. Okay, thank you. Thank you. Thank you, counsel. That concludes argument in this case.